**UNITED STATES of America, Appellee,**

**v.**

**Peter PETSAS, Appellant.**

**No. 78–1090.**

United States Court of Appeals,
Ninth Circuit.

Jan. 11, 1979.

Rehearing Denied March 28, 1979.

[redacted]

Chester L. Brown (argued), of Brown & Newton, Beverly Hills, Cal., for appellant.

J. P. Gray, Asst. U.S. Atty. (argued), Los Angeles, Cal., for appellee.

Before ANDERSON and HUG, Circuit Judges, and SOLOMON *, Senior District Judge.

SOLOMON, Senior District Judge:

Appellant, Peter Petsas, was convicted by a jury of fifteen counts of causing false information to be submitted to the United States Department of Housing and Urban Development (HUD) in violation of 18 U.S.C. § 1010. He was sentenced to eighteen months in prison and a $5,000 fine on Count One. He received concurrent eighteen month sentences for each of the fourteen other counts.

Petsas was in the business of buying houses, usually from the HUD, repairing and then selling them. Occasionally, he repaired and sold houses for others including the Chairman of the Board of Mechanics National Bank (Bank).

The Federal Housing Authority (FHA) insures mortgages on favorable terms, particularly for buyers who intend to occupy the houses. The FHA requires credit reports, verified statements of assets and down payments from the buyers themselves.

---

\* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

To obtain FHA insured mortgage loans on his own houses or on houses which he repaired and was handling for others, Petsas would rent the houses but would falsely represent that the renters were buyers. Petsas got them to sign the necessary applications and forms to be delivered to the FHA. Some of them signed because they thought the forms were necessary to rent the houses. Others signed the forms in blank or without being given the opportunity to read them. Still others could not read English.

Petsas usually took the forms to the Bank to process and submit to the FHA for approval. Petsas worked with Sharon Barrow, an employee in the escrow department of the Bank. He gave her "down payments" on the houses and at times she gave him false verifications of deposits not yet made.

When the FHA made the commitment to guarantee the mortgage, the Bank loaned the money and distributed the mortgage proceeds. When there was surplus on the deposits for closing costs, checks for the surplus payable to the buyers were delivered to Petsas who had them endorse and return the checks to him.

### Deferred Prosecution Agreement

Petsas contends that the indictment should have been dismissed because of his December 1975 agreement with the government. Petsas was then charged with a misdemeanor for a similar false statement. The government agreed to defer prosecution and place Petsas on informal probation for one year. The government promised that it would not press the charge if Petsas successfully completed the probation. Petsas agreed to these terms.

Petsas in the court below asserted that an FBI agent assured him that if he signed the agreement, he would not be prosecuted for any related crime. And Petsas contends that these offenses which arose before that time, which include Magana and Wesley, must be dismissed to enforce the agreement.

The government denied that the agent had authority to make such an agreement and also denied that the agent made it.

The district court, after a hearing, found against Petsas. This ruling was amply supported by the evidence.

Petsas also contends that this prosecution is barred because he was not indicted until after he completed his probation. There is no merit to this contention. Due process does not obligate the government to immediately indict probationers on other charges.

Petsas' motion to dismiss the indictment was properly denied.

### Continuance

Petsas contends that the court abused its discretion when it denied his motion for a second continuance.

Petsas was indicted September 26, 1977 and arraigned a week later. Thereafter, his trial was set for October 28. Petsas retained a new attorney immediately before this trial date. On the 28th, the court permitted the new attorney to be substituted and continued the case until November 22 on the understanding that Petsas would not seek another continuance. Notwithstanding this agreement, Petsas on November 21 moved for another continuance. This motion was denied and the trial started on November 22.

The granting of a continuance is committed to the discretion of the trial court. *United States v. Bryan*, 534 F.2d 205, 206 (9th Cir. 1976). Petsas has not pointed out any additional evidence which he would have been able to present at a later trial or demonstrated that his defense was by the denial prejudiced. There was no abuse of discretion here. *United States v. Makley*, 468 F.2d 916, 917 (9th Cir. 1972).

### Government Impeachment of Its Own Witness

Petsas also contends that the court abused its discretion when it permitted the government to impeach Sharon Barrow, its witness, with her prior felony conviction.

The witness was employed by the Bank when these mortgages were arranged and she worked on some of the transactions. She was convicted for false statements to the FHA in connection with some of them.

Before trial, Petsas stated that he would not impeach Barrow with this conviction and he then moved to prohibit the government from impeaching her. The court instructed the government not to impeach her for this conviction although it indicated that it would reconsider this ruling if it later thought that she was lying.

Barrow testified about bank procedures and Petsas' activities as a go-between. She testified that she falsely completed deposit verifications and that Petsas deposited down payments for apparent buyers after she delivered deposit verification forms to him.

The court then asked Barrow why she falsely verified that down payments were already deposited and she said that she thought verification was unnecessary. Government counsel asked for permission to impeach her because her answers to the court's questions were false. Over Petsas' objection, the court granted the request and permitted the government to bring out that Barrow had been convicted of a felony.

Petsas contends that the government called Barrow solely to impeach her. The record however shows that Barrow gave relevant and material testimony about bank procedures and Petsas' acts.

We are persuaded that the ruling was correct, but even if erroneous, it was harmless. Rules 607 & 609(a), Fed.R.Evid.; Rule 52(a), F.R.Cr.Proc.; *United States v. Binger*, 469 F.2d 275, 276 (9th Cir. 1972).

### Habit Evidence

■ Petsas offered testimony of other purchasers in support of his contention that he routinely acted honestly. The court properly excluded this testimony. *See* Fed. R.Evid. 404(b). But the court did permit Petsas' character witnesses to testify about his honesty.

### Evidence

■ Petsas contends that the evidence does not support the convictions.

Rafael Magana testified through an interpreter. He said that he and his wife got in touch with Petsas after they saw the "For Rent" sign on the house. They told Petsas that they wanted to rent it.

At Petsas' request, Magana signed the mortgage insurance papers so that he could rent the house. He did not read the forms because he could not read English. He said he never intended to buy the house, did not make a down payment and that the statement of assets in the form was overstated.

Magana's wife also testified through an interpreter. She signed the forms because Petsas told her it was necessary so that he could check their credit.

James and Loretta Wesley also got in touch with Petsas because of a "For Rent" sign. They signed the mortgage insurance papers at the request of Petsas who told them to sign so that they would get an option to buy the house. They did not read the forms and signed some of them in blank. They did not make a deposit of $600.00 as stated in the forms, their assets were overstated and the statement that they had money on hand from savings to make the down payment was incorrect.

Wesley received a check for $62.34 from the Bank, which was the difference between the actual closing costs and the amount he was supposed to have deposited. He gave it to Petsas.

Petsas received money paid out on mortgages insured by the FHA as a result of false statements. The evidence that Petsas caused these false statements in the mortgage insurance applications amply supports the convictions on the Magana Counts (I and II) and the Wesley Counts (VII and VIII).

### Other Counts

Under the concurrent sentence doctrine, it is unnecessary to consider the other eleven counts. Nevertheless, we have examined each contention made by Petsas direct-

ed towards these counts and find that none have an adverse collateral effect on Petsas' conviction. *United States v. Wing,* 450 F.2d 806 (9th Cir. 1971), *cert. denied,* 405 U.S. 994, 92 S.Ct. 1267, 31 L.Ed.2d 462 (1972); *United States v. Walls,* 577 F.2d 690, 699 (9th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978). In fact none of these contentions have any merit.

AFFIRMED.